UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HERITAGE EQUITY GROUP 401(k) SAVINGS PLAN, MAX DULL, Trustee of the HERITAGE EQUITY GROUP 401(k) SAVINGS PLAN, EFS, INC., EFS, INC. 401 (k) PLAN, MICHAEL EGAN, Trustee of the EFS, INC. 401 (k) PLAN, MASTRAPASQUA ASSET MANAGEMENT, INC., MASTRAPASQUA ASSET MANAGEMENT, INC. 401(k) PLAN, FRANK MASTRAPASQUA and MAURO MASTRAPASQUA, as trustees of the MASTRAPASQUA ASSET MANAGEMENT, INC. 401(k) PLAN, THE HAMILTON-RYKER GROUP, LLC, THE HAMILTON-RYKER GROUP, LLC 401(k) PLAN, WAYNE MCCREIGHT and CRAWFORD GALLIMORE as trustees of THE HAMILTON RYKER GROUP, LLC, 401(k) PLAN, JIMBO'S NATURAL FAMILY, INC., JIMBO'S NATURAL FAMILY, INC. 401 (k) PLAN, JAMES SOMECK and JO ANN DIEHL, as trustees of JIMBO'S NATURAL FAMILY, INC. 401(k) Plan, COLBERT & WINSTEAD, PC, THE COLBERT & WINSTEAD, PC 401(k) PLAN, RICHARD L. COLBERT and KURTIS J. WINSTEAD, as trustees of COLBERT & WINSTEAD, PC 401(k) PLAN, DEBORAH NIEDERMEYER, Trustee for the DEBORAH NIEDERMEYER INDIVIDUAL 401(k), BRIAN K. ALLEN, Trustee for the BRIAN ALLEN PHOTO INDIVIDUAL 401(k), ABCOW SERVICES, INC., as Sponsor of the ABCOW STAFFING 401(k) RETIREMENT PLAN | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. _____ JURY DEMAND |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MID-ATLANTIC CAPITAL CORPORATION, | ) ) | |
| Defendant. | ) | |

## COMPLAINT

### A. PARTIES

1.    The Heritage Equity Group 401(k) Savings Plan (the "Plan") is a 401(k) investment plan established under 29 U.S.C. § 1002(2)(A) for the purpose of providing retirement benefits to the employees of Beck/Arnley Worldparts Corp. ("Beck/Arnley") and an affiliated corporation.  The Plan was formerly known as the Beck/Arnley 401(k) Savings Plan and was established prior to the events giving rise to this lawsuit.  Beck/Arnley is a corporation organized under the laws of Delaware and has its principal place of business in this judicial district. Beck/Arnley is a plan sponsor and fiduciary of the Plan.  Max Dull is Tennessee resident and is the trustee of the trust created to hold the assets of the Plan.

2.    EFS, Inc. is a Georgia corporation with its principal place of business in Georgia.  EFS, Inc. 401(k) Plan is a retirement benefit plan established for the benefit of the employees of EFS, Inc.  Michael Egan is trustee of the trust created to hold the assets of this plan.  Mr. Egan resides in Georgia.

3.    Mastrapasqua Asset Management, Inc. is a Tennessee corporation with its principal place of business in Tennessee. Mastrapasqua Asset Management, Inc. 401(k) Plan is a retirement benefit plan established for the benefit of the employees of the company.  Frank

Mastrapasqua and Mauro Mastrapasqua are trustees of the trust created to hold the assets of this plan and both reside in Tennessee.

4.    The Hamilton-Ryker Group, LLC is a Tennessee limited liability company with its headquarters in Tennessee. The Hamilton-Ryker Group, LLC 401(k) Plan is a retirement benefit plan established for the benefit of the company's employees. Wayne McCreight and Crawford Gallimore are residents of Tennessee and are trustees of the trust created to hold the assets of this plan.

5.    Jimbo's Natural Family, Inc. is a California corporation with its principal place of business in California. Jimbo's Natural Family, Inc. 401(k) Plan is a retirement benefit plan established for the benefit of the employees the company. James Someck and Jo Ann Diehl are residents of California and are trustees of the trust created to hold the assets of this plan.

6.    Colbert & Winstead, PC is a Tennessee limited liability professional company with its headquarters in Tennessee. The Colbert & Winstead, PC 401(k) Plan is a retirement benefit plan established for the benefit of the Colbert & Winstead's employees. Richard L. Colbert and Kurtis J. Winstead are residents of Tennessee and are trustees of the trust created to hold the assets of this plan.

7.    Plaintiff Deborah Niedermeyer is a resident of the state of Washington.

3

8. Plaintiff Brian K. Allen is a resident of the state of Washington. Mr. Allen does business as Brian Allen Photographer, which is a sole proprietorship doing business in the state of Washington.

9. Abcow Services, Inc. is a California non-profit corporation with its principal place of business in California.

10. Defendant Mid-Atlantic Capital Corporation is a Pennsylvania corporation with its principal place of business in Pennsylvania.

## B. JURISDICTION AND VENUE

11. Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over the claims of plaintiffs Heritage Equity Group 401(k), EFS, Inc. 401(k) Plan, Hamilton-Ryker Group, LLC 401(k) Plan, Jimbo's Natural Family, Inc. 401(k) Plan, Colbert & Winstead PC 401(k) Plan, and the trustees of those plans, because the amount in controversy with respect to the claims of each of these plaintiffs exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship. The Court has supplemental jurisdiction over the claims of the remaining plaintiffs under 28 U.S.C.§ 1367.

12. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to plaintiffs' claims occurred in this judicial district.

4

## C. FACTUAL ALLEGATIONS

13.     During all times material to this case, Barry Stokes of Dickson, Tennessee owned and operated a company called 1Point Solutions, LLC.   1Point Solutions purported to provide administrative and investment services to employee benefit plans.   Mr. Stokes was a registered securities representative and an investment advisor representative.

14.     Each of the plaintiffs in this case engaged Mr. Stokes and 1Point Solutions to provide various services for their employee benefit plan assets.   Mr. Stokes and 1Point Solutions were engaged, among other things, to provide plaintiffs with securities in which to invest plan assets, to facilitate those investments, and to provide administrative services to the employee benefit plans.

15.     During the years 2002-2006, plaintiffs entrusted significant retirement plan assets to Mr. Stokes and 1Point Solutions.

16.     Unknown to plaintiffs, at the time they engaged Mr. Stokes and 1Point Solutions, and on all occasions when plaintiffs entrusted funds to him and his company, Mr. Stokes did not intend to invest plaintiffs' assets appropriately and intended to misappropriate plaintiffs' funds and/or use them in an unauthorized and unlawful manner.

17.     In the fall of 2006, plaintiffs learned that Mr. Stokes had stolen the money that plaintiffs transferred to him.   Throughout some or all of the time that plaintiffs utilized his services, and unknown to

plaintiffs, Mr. Stokes stole and utilized plaintiffs' assets for his own purposes. Mr. Stokes also created and sent to plaintiffs fictitious account statements reflecting alleged asset portfolios that did not exist.

18. Mr. Stokes and 1Point Solutions are now in bankruptcy. Mr. Stokes has been indicted and is in jail.

19. From September 2000 to 2006, another company controlled by Mr. Stokes, 1Point Administrative Services, had a brokerage agreement with defendant Mid-Atlantic Capital Corporation ("MACC").

20. MACC is a registered broker dealer and a member of the National Association of Securities Dealers. MACC is also registered as a broker dealer with the state of Tennessee. MACC's website states that it provides a broad array of financial products and services.

21. Pursuant to the brokerage agreement between MACC and 1Point Administrative Services, MACC agreed, among other things, to accept and hold assets of employee benefit plans to which 1Point Administrative Services was providing services and to facilitate the investment of those assets. Under the agreement, MACC charged fees for its services.

22. The agreement between MACC and 1Point Administrative Services provided that MACC would accept and hold assets of employee benefit plans utilizing the services of 1Point Administrative Services only if an employee benefit plan executed a Confirmation of Authorization that

6

authorized 1Point Administrative Services to receive, invest, and/or disburse the assets of the plan.

23.    None of the plaintiffs ever executed or provided to MACC the Confirmation of Authorization required by the agreement between MACC and 1Point Administrative Services.    Notwithstanding the absence of authorization, Mr. Stokes transferred the assets of plaintiff into an account controlled by MACC.    These transfers were as follows.

(a)   In May of 2005, Mr. Stokes transferred more than $6 million dollars of Heritage Equity Group 401(k) Savings Plan assets into the MACC account.

(b)   In May of 2002, Mr. Stokes transferred more than $146,000 of Jimbo's Natural Family, Inc. 401(k) Plan assets into the MACC account.

(c)   In October 2002, Mr. Stokes transferred more than $442,000 of EFS, Inc. 401(k) Plan assets into the MACC account.

(d)   In May of 2003, Mr. Stokes transferred more than $2,700 of Abcow Staffing 401(k) Plan assets into the MACC account.

(e)    In January of 2005, Mr. Stokes transferred more than $304,000 of The Hamilton-Ryker Group, LLC 401(k) Plan assets into the MACC account.

(f)    In January of 2005, Mr. Stokes transferred $25,000 of Mastrapasqua Asset Management, Inc. 401(k) Plan assets into the MACC account.

(g) In November 2005, Mr. Stokes transferred more than $270,000 of Colbert & Winstead, PC 401(k) Plan assets into the MACC account.

(h) In June 2005, Mr. Stokes transferred more than $16,000 of Deborah Niedermeyer Individual 401(k) Plan assets into the MACC account.

(i) In June 2005, Mr. Stokes transferred more than $5,000 of Brian Allen Photo Individual 401(k) Plan assets into the MACC account.

24. The transfer documents that facilitated each of the above-referenced transfers of plaintiffs' assets made clear to MACC that the assets were to be held for the benefit of the particular employee benefit plan whose assets were transferred.

25. Thus, MACC was aware that it was receiving assets which belonged to plaintiffs and with respect to which Mr. Stokes owed fiduciary duties. Notwithstanding this knowledge, MACC commingled the assets of each plaintiff in a single bank account.

26. Furthermore, MACC improperly permitted Mr. Stokes to transfer amounts from the MACC account to an alleged entity called 1Point 401(k) Plan far in excess of the amounts that 1Point 401(k) Plan had deposited into the MACC account. Having "laundered" plaintiffs' assets through the MACC account and into an account over which he had unfettered control, Mr. Stokes was then free to use plaintiffs' assets as he chose.

8

27.    MACC also permitted Mr. Stokes to transfer plaintiffs' funds to entities that had either deposited no money into the MACC account or had deposited far less than Mr. Stokes transferred out.

28.    The following transfers are examples of the numerous improper transactions that MACC permitted and facilitated:

(a)  On 7-2-02, MACC transferred $191,000 to a 1Point 401(k) Plan account at Raymond James.  Prior to this transfer, the 1Point 401(k) Plan had transferred less than $50,000 into the MACC account.

(b)  On 7-10-02, MACC transferred $292,299.05 to an unnamed account with United Missouri Bank.  Previously, no amounts had been transferred from the United Missouri Bank account into the MACC account.

(c)  On 8-2-02, MACC transferred $34,000 to an account in the name of Seton Home Study School, an alleged entity that had not transferred any assets into the MACC account.

(d)  On 8-14-02, MACC transferred $38,000 to an account in the name of Cape Canaveral Volunteer Fire Department, an alleged entity that had not transferred any assets into the MACC account.

(e)  On 8-15-02, MACC transferred $191,000 to a 1Point 401(k) Plan account, even though 1Point 401(k) Plan had not previously transferred these funds into the MACC account.

9

(f)  On 9-17-02, MACC transferred $49,000 to an account in the name of Headwaters Group 401(k) Plan, an alleged entity that had not transferred any assets into the MACC account.

(g)  On 10-23-02, MACC transferred $192,000 to an account in the name of CDS Administrative Services Trust, an alleged entity that had not transferred any assets into the MACC account.

(h)  On 1-15-03, Mr. Stokes transferred into the MACC account more than $1.5 million for the benefit of the Crosslin Supply Plan. Immediately before this transfer, the MACC account had a <u>negative</u> balance.  The following day, MACC transferred $139,000 of the money that came from Crosslin Supply to an account in the name of 1Point 401(k) Plan.  Over the next three months, MACC made a number of additional transfers of money that came from Crosslin Supply to an account in the name of 1Point 401(k) Plan.

(i)  In October of 2003 and in June, July, August, and December of 2004, MACC sold assets in another account defendant had set up in the name of 1Point Administrative Services, transferred the proceeds to the commingled MACC account, and then allowed Mr. Stokes to transfer the funds to a 1Point 401(k) Plan account.  The assets that had been sold, however, had not been purchased with money that was contributed by 1Point 401(k) Plan.

(j) On 8-26-04, MACC transferred to a 1Point 401(k) Plan account assets that came from another account that MACC had set up in the name of a company called Tatham.

(k) In January of 2005, the day after Hamilton-Ryker and Mastrapasqua plan assets were transferred into the MACC account, MACC transferred $128,000 of the assets of these plaintiffs to a 1Point 401(k) Plan account.

(l) In May of 2005, shortly after over $6 million in Heritage Equity Group plan assets were transferred into the MACC account, MACC transferred the majority of this money to Crosslin Supply, Greenpeace, Calvert Shareholder Services, and two art dealers from which Mr. Stokes purchased Japanese block prints.

(m) On 11-21-05, $270,000 of Colbert & Winstead 401(k) Plan assets was transferred into the MACC account. The balance of the account prior to this transfer was less than $5,000. Immediately after the transfer, MACC transferred to a 1Point 401(k) Plan account $271,000.

29. These and other transactions provided powerful notice to MACC that Mr. Stokes was breaching his fiduciary duties to plaintiffs and others and wrongfully converting assets. MACC facilitated and failed to prevent Mr. Stokes' improper transfers and his conversion of plaintiffs' funds. Mr. Stokes was clearly violating his fiduciary duties by transferring plaintiffs' funds to entities that had no right to the funds. In

11

addition, as noted above, MACC had never received authorization from plaintiffs permitting Mr. Stokes to make transfers of plaintiffs' assets.

30.    Furthermore, the assets of plaintiffs and other employee benefit plans sat for many months and/or years in the commingled MACC account without being invested in the manner in which employee benefit plans are invested.  For this additional reason, it was obvious to MACC that Mr. Stokes handling of these fiduciary funds was improper.

31.    The egregiousness of MACC's failure to prevent Mr. Stokes' unlawful conversion of plaintiffs' funds is compounded by the fact that Mr. Stokes' had a public record of other misconduct and financial problems.  This record includes the following:

(a)  Mr. Stokes took bankruptcy in 1984.

(b)  A company owned by Mr. Stokes took bankruptcy in 1984.

(c)  In December 2000, Mr. Stokes was terminated by The Advisor Group because he failed to cooperate with the firm's investigation of Mr. Stokes' receipt of funds from a client and provided The Advisor Group with falsified documentation.

(d)  In March 2001, Mr. Stokes received a formal caution from the NASD because he had failed to disclose certain outside business activities to The Advisor Group as required by NASD rules.

32.    Plaintiffs bring this action to recover the losses they have suffered as a result of the misconduct of Mr. Stokes and defendant MACC.

## D. LEGAL CLAIMS

## COUNT ONE – VIOLATION OF TENNESSEE SECURITIES ACT

33.     Plaintiffs incorporate herein paragraphs 1-32 above.

34.     In connection with the offer and sale of securities, Barry Stokes intentionally and recklessly employed devices, schemes, and artifices to defraud, made material misrepresentations, failed to disclose material information, and engaged in acts, practices, and a course of business which operated as a fraud or deceit on the plaintiffs, all in violation of the Tennessee Securities Act (the "Act"), T.C.A. § 48-2-121, and actionable under T.C.A. § 48-2-122.

34.     Plaintiffs reasonably relied on Mr. Stokes' representations and were unaware of the true facts.

35.     Plaintiffs have been damaged as a result of Mr. Stokes' misconduct.

37.     Defendant is liable under T.C.A. § 48-2-122(g) for the securities law violations of Mr. Stokes because defendant is a broker dealer that materially aided Mr. Stokes in his violation of the Act.   In addition, defendant had the power, directly or indirectly, to control the activities of Mr. Stokes that damaged plaintiffs.

38.     Pursuant to T.C.A. § 48-2-122, plaintiffs are entitled to recover from defendant their lost principal, interest, and attorney's fees.

13

## COUNT TWO – AIDING AND ABETTING COMMON LAW FRAUD

39.     Plaintiffs incorporate herein paragraphs 1-32 above.

40.     In connection with his dealings with plaintiffs, Barry Stokes intentionally and recklessly employed devices, schemes, and artifices to defraud, made material misrepresentations, failed to disclose material information, and engaged in acts, practices, and a course of business which operated as a fraud or deceit on the plaintiffs, all in violation of the common law of fraud.

41.     Plaintiffs reasonably relied on Mr. Stokes' representations and were unaware of the true facts.

42.     Plaintiffs have been damaged as a result of Mr. Stokes' misconduct.

43.     Defendant knew that Mr. Stokes was mishandling and transferring plaintiffs' assets without authorization and that he was sending them to entities that had no right to plaintiffs' assets. Despite this knowledge, defendant provided material assistance to Mr. Stokes' fraudulent transfer of plaintiff's assets.

44.     In addition, having accepted assets that it knew were owned by plaintiffs, defendant owed a duty to plaintiffs to exercise reasonable care to safeguard those assets. Defendant gave substantial assistance to Mr. Stokes' misconduct and defendant's own conduct, separately considered, constituted a willful or negligent breach of duties owed to plaintiffs.

14

45.     Defendant is therefore liable for the damages caused by Mr. Stokes' fraud.

46.     Plaintiffs are entitled to recover from defendant compensation for all plaintiffs' losses, plus interest.

47.     Plaintiffs are also entitled to recover punitive damages because of defendant's reckless and conscious disregard of plaintiffs' rights.

## COUNT THREE – AIDING AND ABETTING CONVERSION

48.     Plaintiffs incorporate herein paragraphs 1-32 above.

49.     Barry Stokes unlawfully converted assets owned by plaintiffs.

50.     Plaintiffs have been damaged as a result of Mr. Stokes' misconduct.

51.     Defendant knew that Mr. Stokes was transferring plaintiffs' assets without authorization and that he was sending them to entities that had no right to plaintiffs' assets.  Despite this knowledge, defendant provided material assistance to Mr. Stokes' conversion of plaintiff's assets.

52.     In addition, having accepted assets that it knew were owned by plaintiffs, defendant owed a duty to plaintiffs to exercise reasonable care to safeguard those assets.  Defendant gave substantial assistance to Mr. Stokes' misconduct and defendant's own conduct, separately

15

considered, constituted a willful or negligent breach of duties owed to plaintiffs.

53. Defendant is therefore liable for the damages caused by Mr. Stokes' fraud.

54. Plaintiffs are entitled to recover from defendant compensation for all plaintiffs' losses, plus interest.

55. Plaintiffs are also entitled to recover punitive damages because of defendant's reckless and conscious disregard of plaintiffs' rights.

## COUNT FOUR – AIDING AND ABETTING FIDUCIARY BREACH

56. Plaintiffs incorporate herein paragraphs 1-32 above.

57. In violation of his fiduciary duties, Barry Stokes unlawfully converted assets owned by plaintiffs.

58. Plaintiffs have been damaged as a result of Mr. Stokes' misconduct.

59. Defendant knew that Mr. Stokes was mishandling and transferring without proper authorization assets of clients to which he owed fiduciary duties and that he was sending the assets to entities that had no right to plaintiffs' assets. Despite this knowledge, defendant provided material assistance to Mr. Stokes' conversion of plaintiff's assets.

60. In addition, having accepted assets that it knew were owned by plaintiffs, defendant owed a duty to plaintiffs to exercise reasonable

16

care to safeguard those assets.  Defendant gave substantial assistance to Mr. Stokes' misconduct and defendant's own conduct, separately considered, constituted a willful or negligent breach of duties owed to plaintiffs.

61.    Defendant is therefore liable for the damages caused by Mr. Stokes' fraud.

62.    Plaintiffs    are    entitled    to    recover    from    defendant compensation for all plaintiffs' losses, plus interest.

63.    Plaintiffs are also entitled to recover punitive damages because of defendant's reckless and conscious disregard of plaintiffs' rights.

## COUNT FIVE – NEGLIGENCE

64.    Plaintiffs incorporate herein paragraphs 1-32 above.

65.    Having accepted assets that it knew were owned by plaintiffs, defendant owed a duty to plaintiffs to exercise reasonable care to safeguard those assets.

66.    In violation of that duty of care, defendant allowed Mr. Stokes to transfer plaintiffs' assets without the authorization required by defendant's contract with Mr. Stokes and to transfer assets to entities that had no legal right to them.

67.    Plaintiffs    are    entitled    to    recover    from    defendant compensation for all plaintiffs' losses, plus interest.

## COUNT SIX – CONVERSION

68.    Plaintiffs incorporate herein paragraphs 1-32 above.

69.    Defendant lacked proper authority to exercise dominion or control over plaintiff's assets.

70.    In transferring plaintiffs' funds to other entities, defendant unlawfully converted plaintiffs' funds.

71.    Plaintiffs are entitled to recover from defendant compensation for all plaintiffs' losses, plus interest.

72.    Plaintiffs are also entitled to recover punitive damages because of defendant's reckless and conscious disregard of plaintiffs' rights.

THEREFORE, plaintiffs respectfully request that the Court:

(a)    Award judgment in favor of each plaintiff and against defendant for all losses incurred by plaintiffs as a result of the misconduct set forth above.

(b)    Award prejudgment interest and attorneys' fees in favor of each plaintiff.

(c)    Award punitive damages in favor of each plaintiff and against defendant in such amount as the jury deems proper.

(d)    Afford plaintiffs a trial by jury.

(e)    Provide such relief as the Court deems to be just and proper.

Respectfully submitted,

18

*/s/ H. Naill Falls Jr.*
H. Naill Falls Jr., BPR # 6787
John B. Veach III, BPR # 8994
FALLS  & VEACH
1143 Sewanee Rd.
Nashville, TN 37220
615/242-1800

Attorneys for Plaintiffs


*/s/ Dianna Baker Shew*
Dianna B. Shew, BPR # 12793
Elizabeth H. Ferguson BPR # 20362
Stites & Harbison
424 Church St., Suite 1800
Nashville, TN 37219

Attorneys for Plaintiffs
Heritage Equity Group 401(k)
Savings Plan, Gail H. Holt,
Trustee, Kelly Riley, Trustee,
and Beck/Arnley Worldparts
Corp.

19